628 S.E.2d 888

**In the Matter of Dean D. PORTER, Respondent.**

**No. 26131.**

Supreme Court of South Carolina.

Submitted Feb. 6, 2006.

Decided April 3, 2006.

Henry B. Richardson, Jr., Disciplinary Counsel, and Charles N. Pearman, Assistant Disciplinary Counsel, both of Columbia, for the Office of Disciplinary Counsel.

Justin O'Toole Lucey, Mount Pleasant, for respondent.

PER CURIAM.

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21, RLDE, Rule 413, SCACR. In the Agreement, respondent admits misconduct and consents to a definite suspension of ninety (90) days. We accept the Agreement and definitely suspend respondent from the practice of law in this state for a ninety (90) day period. The facts, as set forth in the Agreement, are as follows.

## *FACTS*

Respondent served as a title insurance agent for a title insurance company. During a routine audit, the title insurance company determined there were unpaid premiums due from respondent for the title insurance company's share of premiums for title insurance issued by respondent.[1]

The amount claimed due from respondent by the title insurance company after the audit was approximately $12,000. The title insurance company requested payment of that amount from respondent, but respondent advised the title

---

1. Under the terms of the agency agreement between respondent and the title insurance company, respondent typically received sixty percent of the premiums and the title insurance company received forty percent of the premiums.

insurance company he did not have adequate funds to make payment at that time, but would do so in the future on a periodic basis under a plan agreed to by the title insurance company and respondent. Respondent represents that, unbeknownst to him, the premiums had been placed in his firm's operating account and then disbursed by his now deceased non-lawyer assistant.

Approximately one year later, the title insurance company conducted another audit of respondent's operations. As a result, the title insurance company determined there was an additional sum of approximately $12,524 due from respondent for premiums which had been collected but for which policies had not been issued. These un-issued policies were in connection with real estate closings which, in some cases, had taken place several months prior to the second audit.

After the second audit, the title insurance company terminated its agency agreement with respondent and took possession of its title insurance policies and files related to policies where commitments/binders had been issued and closings conducted, but final policies had not been issued by respondent.[2] The title insurance company did the work necessary to complete the closings and issued final policies for those files in accordance with the commitments/binders previously issued by respondent as its agent.

After it became dissatisfied with respondent's progress in paying the past-due premiums, the title insurance company reported the foregoing to ODC.[3] ODC then made inquiries and determined that the amounts collected by respondent for title insurance premiums had been deposited into respondent's

---

[2]. During this period of time, respondent's non-lawyer assistant who handled his title insurance work and was the principal point of contact between respondent's firm and the title insurance company died in an accident and another non-lawyer assistant left respondent's employ. The loss of these two employees caused the title insurance company to become concerned about whether respondent had sufficient staff, especially in view of the backlog of non-issued final policies created after the loss of the two employees. According to the Agreement, the title insurance company terminated its agency agreement with respondent primarily because of the staffing shortage at respondent's firm.

[3]. The title insurance company's report to ODC occurred quite some time after it conducted the two audits.

escrow account and then transferred into his operating account. Thereafter, portions of these funds were expended out of the operating account for the cost of operation of respondent's firm, for respondent's benefit, or for other purposes than intended.

Respondent now recognizes that, in addition to being contrary to the provision of Rule 1.15, Rule 407, SCACR, his handling of the insurance premiums was contrary to the provisions of the agency agreement between respondent and the title insurance company. The agency agreement provided that funds collected for title insurance premiums would be maintained by respondent in an account separate from respondent's own funds or those of his law firm.

Respondent represents, however, that the title insurance company was aware of his method in handling the insurance premiums and did not object. To the best of ODC's knowledge, this was, in fact, true. Moreover, the agency agreement did not specifically address how often or under what circumstances the title insurance company's portion of premiums would be transmitted by respondent to the title company. Nevertheless, respondent recognizes the funds should have been maintained in a separate account. Should he ever collect premiums for title insurance companies in the future, respondent agrees to place insurance premiums in a separate account. Respondent admits he did not personally reconcile his escrow account in strict compliance with the provisions of Rule 417, SCACR.

By way of mitigation and not as a defense, respondent represents the following: that he had a very capable, experienced paralegal who worked extensively on loan closings and related title insurance matters and who was his principal point of contact with the title insurance company; that the arrangement for the handling of title insurance policies and title insurance premiums was handled by the paralegal; that the title insurance company had previously audited respondent's firm, escrow account, and the title insurance operations, was aware of the paralegal's role, and was apparently satisfied with respondent's performance as an agent until past due premiums came to light; that even after the title insurance company determined there were amounts due for policies

previously issued, it continued its agency agreement with respondent for quite some time thereafter until it became dissatisfied with respondent's progress in repaying the premiums it felt it was due; that the paralegal died as a result of injuries sustained in an automobile accident and another key non-lawyer employee left respondent's firm, causing respondent to fall behind in completion of closings (which included failing to issue final title insurance policies and transmitting premiums to the title insurance company). According to respondent, immediately prior to the final audit, an employee of the title insurance company advised respondent that his books and records were in excellent shape.[4]

Respondent now recognizes that he should have more closely supervised his non-lawyer staff, especially in connection with the handling of premiums collected for title insurance policies; that the premiums should have been maintained in his escrow account or in some other account separate from his operating account and should not have been expended except for their intended purpose; that respondent should have strictly complied with the recordkeeping and money handling requirements of Rule 417, SCACR; that he should have maintained better records as to what amounts were due the title insurance company including, but not limited to respective policy numbers, file numbers, and premium amounts due for each policy; that he should have been more prompt in making payment to the title insurance company of its share of premiums collected; that he should have reduced his intake of new real estate files until he was able to catch up on the backlog of completed closings and issuance of title insurance policies after the loss of his two key non-lawyer employees; that, due to the foregoing, respondent was not as diligent as he should have been in handling real estate matters for his clients which, in turn, caused the quality of services provided those clients not to have been as competent as they should have been.

---

4. ODC disagrees with the opinion of the title insurance company employee and respondent now recognizes that, in regard to title insurance premiums, there were irregularities in his recordkeeping and money handling procedures notwithstanding the apparent lack of disapproval by the title insurance company.

To date, in spite of considerable expenditures of time and effort, ODC has been unable to reconcile to its satisfaction the exact amounts due the title insurance company and must, instead, rely on the agreement between the title insurance company and respondent as to the amounts due. Complicating ODC's investigation is the fact that the title insurance company applied premiums for subsequent policies issued by respondent to past due premiums. As a result, the title insurance company's records show as paid amounts it later claimed were unpaid and show as unpaid amounts that cancelled checks from respondent demonstrate have been paid.

Respondent represents he no longer handles real estate closings and, at this time, does not plan to do so in the future. However, should he become involved with real estate closings in the future, respondent warrants he will maintain funds for title insurance either in his escrow account or in an account separate from his own money, keep detailed records as to what funds are due for each policy, and promptly remit the premiums to the insuring title insurance company, together with information specifying which portions of the amount submitted should be applied to each policy issued. The Court specifically adopts these restrictions. Accordingly, if respondent handles real estate closings in the future, he shall comply with each of the restrictions set forth in the Agreement.

## LAW

Respondent admits that, by his misconduct, he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to his client); Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing a client); Rule 1.15 (lawyer shall hold property of third persons in his possession in connection with a representation separate from the lawyer's own property); Rule 5.3 (partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that a non-lawyer assistant's conduct is compatible with the professional obligations of the lawyer); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to the administration of justice). In addition, respondent admits his

misconduct constitutes a violation of Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct) and Rule 7(a)(5) (lawyer shall not engage in conduct tending to bring the legal profession into disrepute or conduct demonstrating an unfitness to practice law). Finally, respondent admits that his misconduct constitutes a violation of the financial recordkeeping provisions of Rule 417, SCACR.

## *CONCLUSION*

We accept the Agreement for Discipline by Consent and definitely suspend respondent from the practice of law for ninety (90) days. Within fifteen days of the date of the suspension, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

Respondent shall pay all title premiums due the title insurance company as a result of the misconduct reported herein and shall demonstrate to the satisfaction of ODC, the Commission on Lawyer Conduct, and the Court that he has paid all title premiums due the title insurance company before he shall be permitted to resume the practice of law in this state.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE and PLEICONES, JJ., concur.

WALLER, J., not participating.